WILLIAM J. OBERLE, INC. (BLUMENTHAL PRINT WORKS) *v.* UNITED
STATES

**No. 4582.**—Invoices dated Courtrai, Belgium, March 30, 1937, etc.
  Certified April 1, 1937, etc.
  Entered at New Orleans, La., April 22, 1937, Los Angeles, Calif.,
  August 16, 1937, etc.
  Entry Nos. 1638, 1776, etc.

(Decided May 29, 1939)

*Isaac S. Heller* for the plaintiff.
*Webster J. Oliver,* Assistant Attorney General (*Richard E. FitzGibbon,* special
attorney), for the defendant.

CLINE, Judge: These appeals for reappraisement involve the value
of certain damask mattress tickings imported from Tissage De
Courtrai and Tissage La Flandre of Courtrai, Belgium, during a
period between November 5, 1936, and September 28, 1937. Sixty-
eight appeals were consolidated for hearing at the port of New Or-
leans. The merchandise covered by four of these appeals was imported
at the port of Los Angeles while all the other shipments were entered
at the port of New Orleans.

The plaintiff contends that the materials should have been appraised
at the export value thereof and not at the United States value, but I
note that the appraiser returned the merchandise invoiced as item
6382 in Belgian francs at the export value in the following cases:   Re-
appraisements 120150–A, 120153–A, 120154–A, 120156–A, 120157–A,
120240–A, 120244–A, 120245–A, 120246–A, 120248–A, 120250–A,
121865–A, 123923–A, 126379–A, 126380–A, 126381–A, 126382–A,
126383–A, 127170–A, 127549–A, 127550–A, 127551–A, 127552–A,
127653–A, 127656–A, and 121992–A.   In 121865–A and 121992–A,
advances were made on entry to meet the advances made by the
appraiser in the test case.   The values in 121992–A are in United
States currency as distinguished from the other cases where the
appraised values were in Belgian francs.   ·

There are about twenty different qualities of damask tickings
covered by these cases and in those qualities there are about fifty or
sixty different patterns.   The appraiser returned all the items, except
No. 6382, at the United States value.   A number of the cases cover
duress entries in which the importer advanced the values to meet
advances made by the appraiser in the test cases.

In his opening statement, counsel for the plaintiff admitted that if
the merchandise is dutiable at the United States value the prices found
by the appraiser for the items are correct and counsel for the defendant

admitted that if the merchandise is dutiable at the export value the invoice prices are correct. This is shown by the following excerpt from the record:

Mr. HELLER. * * * There is no dispute as to what is the United States value, and I don't believe that the Government will dispute the fact that if there is a foreign export value that it is any different than the amount at which these goods have been entered by Blumenthal Print Works.

Mr. FITZGIBBON. That is correct.

Mr. HELLER. There is no dispute as to the conversion rate of the franc into dollars?

Mr. FITZGIBBON. No, there is not.

All of the invoices are priced in United States currency and the entries were made at a unit value per yard in that currency, but, with the exception of the merchandise covered by reappraisement 121992–A, the appraisement on all the goods invoiced as item 6382 was made on the export value, that is at a unit value per meter in Belgian francs. The appraisement on all the other items was made at the United States value in United States currency at a unit price per yard.

The only question involved is whether the merchandise returned by the appraiser at the United States value should be appraised at the export value. The unit values of the fabrics are not in dispute.

The plaintiff introduced in evidence four affidavits which were admitted and marked Exhibits 1, 2, 3, and 4.

Exhibit 1 is an affidavit of Camille Verwee, executed before the American vice consul on January 6, 1937. The affiant is the general manager of the firm Tissage La Flandre, the manufacturer of some of the fabrics covered by these appeals. It is shown by this exhibit that quality "D 5," a sample of which is attached, which was sold to Blumenthal Print Works, is identically the same quality as number "14595" which was delivered to Titus Blatter & Co., of New York.

Exhibit 2 is another affidavit of Camille Verwee, dated July 28, 1937. A large portion of this affidavit is in the form of questions and answers the pertinent parts of which are that the usual wholesale quantities of the materials are one piece of 50 meters or more, but generally the quantities for export are from 5,000 yards up; that there are nine sellers of the ticking in the Courtrai district; that most of the United States purchasers come to the Courtrai district; that representatives of the mills visit different buyers and the buyers visit the different mills; that the manufacturers are usually represented in the United States but the manufacturer also travels in the United States himself in order to see the different customers; that different qualities and also the same quality produced by one manufacturer can be and are sold to different buyers in the United States; that different variations could be made on a quality and still the merchandise would be similar; that the number of threads in the warp and the weft could be

changed 10 per centum, more or less, without changing the general aspect of the goods and a change of yarns in the warp or the weft of the cloth would not affect the similarity; that the tickings are freely offered and sold to different countries of the world, the United States being one of the largest markets and the manufacturers and purchasers are steadily in contact by wire and by correspondence; that standard qualities of the tickings are established; that the purchasers make a choice of designs from various paintings shown to them by the manufacturers; that the design in the ticking business is 90 per centum of the battle, and in the selling of the damask the most important point is the styling of patterns, all qualities imported by various importers being similar.

Exhibit 3 is another affidavit of Camille Verwee, dated January 5, 1938. The affiant states that goods identical to that sold to Blumenthal Print Works and similar goods are manufactured in large quantities in and near the village of Courtrai, Belgium; that there is no established market for this or similar merchandise in Belgium; that the only merchandise sold in Belgium is in small quantities and not in the usual wholesale quantities in the ordinary course of trade; that the usual wholesale quantity in which all sales are made is in units of "one piece" of 50 meters or more in length and the usual width of 56 and 41 inches; that these goods are freely offered for sale, some of the mills keeping a reasonable quantity in stock; that the mills in this district constitute a wholesale market; that manufacturers are prepared to offer merchandise to customers who either come to Europe or are contacted by the manufacturers' representatives in the United States; that all of this damask is similar merchandise, the principal variation being the patterns, although very frequently the same patterns are sold to different buyers in the United States; that the price of mattress ticking does not vary to an appreciable degree, except under certain special circumstances, such as quantities or credit risks entering into the transaction; that the merchandise is of the same texture, structure, and price, and the only difference in texture and structure are of small degree and this difference cannot be determined without expert analysis; that all of these goods are identical in method of manufacture; that the patterns are all commercially interchangeable and frequently one quality is sold to several customers in the United States in different patterns; that all of the goods sold to Blumenthal Print Works are either identical (as far as texture and structure is concerned) or similar to merchandise manufactured by his firm and other mills for other customers and sold in the usual course of trade for exportation to the United States. There are attached to this affidavit certain exhibits (marked A to L) with invoices to Messrs. Titus Blatter &

Co., of New York, attached, which affiant states are bona fide sales by his mill in wholesale quantities for exportation to the United States at about the same time as the shipments herein involved were made to Blumenthal Print Works; that all of these goods are substantially the same warp and weft as the goods sold to Blumenthal Print Works and the yarn is of similar construction; that the invoices show sales of similar merchandise to another purchaser.

Exhibit 4 is another affidavit of Camille Verwee, dated January 3, 1938. Three pieces of damask ticking (marked A, B, and C) are attached thereto merely for illustrative purposes. These exhibits show how the same quality of cloth is woven in different patterns or with different yarns, how different names are given to the patterns and the goods sold to different customers under different item numbers. The affiant states:

> The purpose of all of these panels is to present a part of the picture, as we would have to submit dozens of designs and make different structures of cloth to cover the entire lines. All of this merchandise is damask ticking. All of it is similar and all of it is commercially interchangeable.
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> All of these damasks for all of these customers are made with the same warp, on the same types of looms, with the same types of cards. This is true, of course, not only of the samples that are submitted with this affidavit, but with all other merchandise manufactured for this trade in the foreign export market which exists around Courtrai, Belgium.

The plaintiff called Mr. Sidney Edgar Blumenthal, a member of the importing firm, as a witness. He testified that damask ticking was formerly imported from Czechoslovakia, but twelve or fifteen mills around the village of Courtrai, Belgium, equipped to make tablecloth linens, started to make the tickings; that at first the merchandise was offered for sale in the United States through one concern but subsequently all firms dealing in tickings in the United States went to Europe to establish connections for the purchase of damask tickings; that American buyers go from mill to mill around Courtrai asking for quotations of various quantities of the cloth; that any mill will quote prices on a given quality which is made by virtually all mills and all mills maintain their selling force and to a great extent maintain New York representation. The witness testified further that he had been to Europe twenty or twenty-five times and was familiar with the methods of purchase and sale of the merchandise; that the prices at the different mills in the Courtrai district are substantially the same for the same quality of cloth, except that there is a slight difference where an importer purchases his own cards or designs; that the Blumenthal Print Works has never purchased any cards or designs; that he knows other American firms that purchase in the same way because he met representatives of each one of the

American concerns in Europe and had been with them in various mills when they purchased merchandise; that the merchandise was entered by him at the price paid therefor; that the prices were the usual wholesale prices; that he had seen goods purchased by other American buyers from the mills and the goods were similar to those purchased by him; that he had seen ticking purchased by Titus Blatter which was identical in quality, in yarn count, and in texture to goods purchased by him, referring to item D 5 which was purchased by Titus Blatter as item 14595; that all of the goods purchased by his competitors were similar to those purchased by himself; that the ticking is commercially interchangeable; that if Blumenthal Print Works was out of any of the "low end quality," No. 6382, and it was ordered by one of their customers, they could fill the order by a quality from one of their competitors in the same price range and no living man could tell the difference, unless the cloth was examined in the laboratory.

On cross-examination he testified that there is one quality imported by his firm which is copyrighted, that is the design "Queen Astride"; that no other firm would want to purchase a design that his firm purchased but he had no understanding with the mills that the patterns he purchased were limited to his firm; that he did not know of any firm that purchased ticking having the same design that he purchased; that he buys in quantities from 25 to 30,000 or 200,000 yards; that the mills have designs in stock and they make also special designs, but the greater part of their business is in special designs; that three numbers out of eight that he imports are carried in stock by the mill; that he considers damask ticking similar when the quality is practically the same and the price does not vary more than 2 or 3 per centum, but in low quality goods the price may vary by 5 per centum; that the designs would not have to be identical to be similar goods; that the yarn count in two pieces of ticking might vary from 5 to 8 per centum and the two pieces would still be similar; that a manufacturer who had the ability to style or design his goods better "would be 95 percent easier chance to sell his goods."

On redirect examination the witness produced a sample of damask ticking invoiced as "Queen Astride" which was received in evidence and marked Exhibit 5. The witness testified that he had seen a similar pattern which had been imported by Golding Bros. Co.; that "when a design is gotten out that proves a very popular seller while the design is never duplicated the coloring and the pattern is very closely imitated," and "that is true of virtually every pattern we had during the last two years."

The next witness called by the plaintiff was Frank H. Davis, Jr., an import clerk of the importing company, who testified that the

firm imported about twenty different qualities having between fifty and sixty different designs.

The defendant called Mr. Edwin E. Kirwin, an examiner of merchandise at the port of New Orleans, who passed the goods imported at New Orleans herein under consideration. He testified that when the merchandise came before him for examination, he made inquiry at the importing company and also sent samples of the different designs and grades of ticking to the Customs Information Exchange in New York and asked for values; that he received an answer that no similar merchandise was imported. The witness produced three documents which were received in evidence and marked Exhibits 6, 7, and 8. The witness testified further that he returned the export value of the ticking invoiced as item 6382 but on all other items he returned the United States value.

On cross-examination the attention of the witness was directed to the last two pages of Exhibit 7, giving the details of construction of items D 5 and 14595 and he was asked if the two fabrics were not similar. Although the witness admitted that the construction was the same, he stated that the merchandise would not be similar unless the date of exportation was similar. His attention was directed to a sheet of white paper attached to the exhibit, giving the values of quality 14595 and was asked if the last line on that sheet did not read "The quality 14595 is equal to D 5" and the witness admitted that such statement was made. The statement referred to appears to be written in a foreign language.

Exhibit 6 is a photostatic copy of a request made to the appraiser at New York by the appraiser at New Orleans for values on colored cotton Jacquard mattress ticking, items 6382, plain satin 64", and 6368. The answer gives the values of qualities 250, 6382, 6438, 350 C, 6457, and 6464, after which appears the following:

This manufacturer is now represented by an agent in the U. S. This agent is free to sell all qualities noted herewith to all purchasers in the U. S. So far as these numbers are concerned there appears to be a freely offered export value.

The prices at which No. 6382 are invoiced appear to be in harmony with manufacturers' prices prevailing at date of shipment. No record of No. 6368. Appraisement at U. S. value appears to be proper.

Exhibit 7 appears to have been circulated by the Customs Information Exchange at New York, report C. I. E. 924/38. It contains a copy of a report by Treasury Representative Charles Schlager, dated Paris, France, April 6, 1938. The Treasury representative reports that he visited Tissage La Flandre of Sweveghem, Belgium, on March 15 and 17, 1938, and ascertained that the relationship between the shipper and the importer was that of buyer and seller; that each design is exclusively reserved to one purchaser in the United States and each purchaser desires his own particular qualities; that the manu-

# 972

facturer claims that there is similarity between some of the qualities sold to different customers, quality D5 sold to Blumenthal, although a different design, being of the same construction as quality 14595 sold to Blatter; that "all other qualities produced by this manufacturer are of distinctly different make-up for each customer and a given quality as sold to one customer is not sold or offered for sale to another customer"; that the manufacturer has refused to sell exclusively to one purchaser in the United States; that during the period under investigation sales were made to Blumenthal Print Works, Titus Blatter, and Golding Brothers, although sales are not reserved exclusively to those three customers. There is attached as Exhibit A a tabulation of deliveries to Golding Brothers of New York of various qualities which the manufacturer considers similar to quality D3 sold to Blumenthal Print Works, and, there is attached also, as Exhibit B, a tabulation of deliveries made to Titus Blatter of quality 14595 which the manufacturer stated was similar to quality D5 sold to Blumenthal Print Works. Under the heading "Foreign Value," the report states:

This same or similar qualities of ticking are not sold or offered for sale in Belgium.

Sales for consumption in Belgium are confined to defective merchandise left over from orders placed by United States customers.

Exhibit 8 is a copy of a report circulated by the Customs Information Exchange (C. I. E.—923/38) containing a report by Treasury Representative Charles Schlager, dated April 6, 1938, relating to information obtained on a visit to the factory of Tissage De Courtrai on March 18 and 20, 1938. It appears from this exhibit that this manufacturer has only two customers in the United States, namely, Blumenthal Print Works and Cohen, Hall & Marks, Inc.; that the manufacturer does not limit his sales to those customers, but remains at liberty to sell to anyone; that from June 1936 the relationship between this exporter and the Blumenthal Print Works has been that of seller and purchaser, but that previously there had been an arrangement of sharing profits between the two concerns; that all mattress ticking produced by this manufacturer is produced on order and no stocks are maintained; that no sales or offers for sale were made for this type of merchandise in the home market in Belgium; that item 6382 was sold also to purchasers in London, England, and South Africa.

Some of the witnesses defined the word "similar" as they understood it in reference to the similarity of the imported merchandise to that sold to other purchasers. Since the meaning of words is a matter of law and not a question of fact, the definitions given by the witnesses are not binding on the court. The word "similar," as used in the appraisement section of the Tariff Act of 1922, was defined in

the case of *United States* v. *Irving Massin & Bros.*, 16 C. C. P. A. 19, 25, T. D. 42714, as follows:

> In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b).

I have carefully reviewed the record and find that the weight of evidence establishes the following facts:

1. Jacquard-figured mattress tickings of the kind herein involved are not sold or freely offered for sale in wholesale quantities in the home markets of Belgium for consumption in Belgium.

2. Such tickings are freely sold and offered for sale in Belgium for export to the United States in wholesale quantities and in the ordinary course of trade in the principal market of Belgium.

3. The principal market for the sale of such tickings for export is in the district around Courtrai in Belgium where they are manufactured and sold by at least nine firms.

4. The usual wholesale quantities in which such tickings are sold are one piece of 50 meters or more, but generally the quantities for export are 5,000 yards or more.

5. Buyers from the United States visit the different factories to select suitable designs and qualities of ticking, obtain quotations, and purchase goods. The patterns are not restricted by the manufacturers to one customer but one purchaser usually does not purchase the same pattern that is bought by another. Some ticking is carried in stock by some of the mills, and, when the purchasers do not order stock goods they select patterns from paintings or designs and order tickings therefrom. Many of the mills maintain selling establishments in the United States and also representatives of the mills visit the buyers in the United States.

6. Quality 6382 has been sold to purchasers in other countries.

7. Merchandise identical to quality D 5, covered by the shipments here in issue, was sold to Titus Blatter & Co., of New York, and other qualities sold to the importer in this case have been sold to Titus Blatter & Co. In fact, all of the goods sold to Blumenthal Print Works are either identical to merchandise sold to other firms in the United States or are similar to goods sold to other firms in that they are composed of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses and are so used ordinarily.

8. The ticking designated as "Queen Astride" is copyrighted by Blumenthal Print Works and the weight of evidence is not convincing that ticking similar to that particular quality was sold to other dealers in the United States.

In the case of *Golding Bros. Co., Inc.* v. *United States,* 24 C. C. P. A. 15, T. D. 48289, the value of ticking from Belgium, invoiced as "Commodore" was under consideration. It does not appear from the decision that the question of whether there was an export value of the merchandise or whether similar merchandise was sold for export was considered. According to the decision of the trial court in that case, Reap. Dec. 3680, the ticking was sold to but one firm in the United States and the court held that the merchandise should be appraised upon the United States value thereof.

The record in the case herein is quite different from that in the *Golding Bros. Co., Inc.,* case, *supra.* The facts in this case establish that at the time of exportation there was a market for export to the United States for all the goods except that quality invoiced as "Queen Astride," and I appraise all the merchandise, except quality "Queen Astride," on the export value thereof, which, with the exception of item 6382, is, according to the stipulation of counsel, the entered value on all items not advanced on entry to meet advances made by the appraiser, and, on the items upon which advances were made on entry to meet advances made by the appraiser in the test cases, the unit invoice values. Charges for packing are included in the values.

As to item 6382, I appraise the merchandise at the export values as found by the appraiser, packing included.

As to the merchandise invoiced as "Queen Astride," I appraise the goods at the United States value as found by the appraiser.

Judgment will be entered accordingly.